# United States Tax Court

T.C. Memo. 2023-133

NATHANIEL A. CARTER AND STELLA C. CARTER,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

RALPH G. EVANS,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent[1]

————————

Docket Nos. 23621-15, 23647-15.                    Filed November 6, 2023.

————————

PS, a partnership, owned property known as DH. LE, a conservation biologist for N, a "qualified organization" within the meaning of I.R.C. § 170(h)(3), visited DH several times in October 2011 to document the property's condition. On December 9, 2011, LE provided to N's board the documentation he had compiled. On that date, N's board approved acceptance of PS's gift of a conservation easement on DH. PS conveyed the easement to N on December 27, 2011. In the easement deed, PS reserved the right to build up to 11 homes, 9 docks, and associated roads and driveways on DH at locations to be chosen by mutual agreement of PS and N. The deed prohibits N from approving PS's exercise of any reserved

[1] This Opinion supplements our prior opinion *Carter v. Commissioner*, T.C. Memo. 2020-21, *rev'd and remanded per curiam*, Nos. 20-12200, 20-12201, 2022 WL 4232170 (11th Cir. Sept. 14, 2022).

**[*2]** right that would have a material adverse effect on the easement's conservation purposes.  In spring 2012, LE returned to DH and compiled additional documentation.  Most of the documentation in the final package, however, was compiled from his visits in October 2011.  Ps claimed charitable contribution deductions in respect of PS's contribution on the premise that the easement was worth $14,175,000.  At trial, Ps presented the testimony of appraisers who valued the easement at $10,300,000, having determined that the easement reduced DH's value by 30%.

   *Held*:  To satisfy the requirement of Treas. Reg. § 1.170A-14(g)(5)(i)(D), a written statement attesting to the accuracy of the documentation provided to the donee must be signed by the donor and a representative of the donee before the date of the gift.

   *Held, further*, because Treas. Reg. § 1.170A-14(g)(5)(i)(D) requires the donor and donee to jointly certify the accuracy of clearly referenced documentation, a unilateral representation by a donor to a donee in an easement deed does not satisfy the requirement.

   *Held, further*, if a taxpayer's failures to strictly comply with a rule do not prevent achievement of the rule's purposes, the rule in question is directory rather than mandatory and the taxpayer's partial compliance can be accepted as substantial compliance.

   *Held, further*, because the documentation available to N as of December 27, 2011, was sufficient to enable N to fulfill its responsibility of preventing PS from exercising reserved rights in DH in a manner that would undermine the easement's conservation purposes, PS substantially complied with the documentation requirements of Treas. Reg. § 1.170A-14(g)(5)(i).

   *Held, further*, because PS's exercise of its reserved rights in DH are subject to N's approval, and N is prohibited by the easement deed from approving an exercise of reserved rights that would have a material

**[*3]** adverse effect on the easement's conservation purposes, PS's reserved rights do not violate the requirement of I.R.C. § 170(h)(5)(A) that a contribution's conservation purpose be protected in perpetuity; the exercise of reserved rights that would have, at most, an immaterial effect on conservation purposes would not be inconsistent with those purposes. *See* Treas. Reg. § 1.170A-14(g)(1).

*Held, further*, the testimony of Ps' expert appraisers did not reliably establish the easement's value because they were unable to explain their determination that the easement reduced DH's value by 30%.

*Held, further*, the easement that PS conveyed to N was worth $1,000,000 when contributed, as determined by R's expert appraiser.

*Held, further*, because PS reported the easement as having a value of more than 200% of its actual value, that reporting effected a gross valuation misstatement, within the meaning of I.R.C. § 6662(e)(1)(A) and (h)(2)(A) and, consequently, Ps are subject to 40% gross valuation misstatement penalties on the portions of their underpayments attributable to the excess of $14,175,000 over $1,000,000.

—————

*Vivian D. Hoard*, for petitioners.

*Shannon E. Craft, Christopher D. Bradley*, and *Tamara R. McCray*, for respondent.

## SUPPLEMENTAL MEMORANDUM
## FINDINGS OF FACT AND OPINION

HALPERN, *Judge*: These cases are before the Court on remand from the U.S. Court of Appeals for the Eleventh Circuit. *Carter v. Commissioner*, Nos. 20-12200, 20-12201, 2022 WL 4232170 (11th Cir. Sept. 14, 2022), *rev'g and remanding per curiam* T.C. Memo. 2020-21. Our initial opinion in the cases concluded that petitioners were not entitled to charitable contribution deductions as a result of the

[*4] conveyance by Dover Hall Plantation, LLC (usually, the partnership) to the North American Land Trust (NALT) of an easement on property known as Dover Hall. In particular, following an analysis initially adopted by the Court in *Pine Mountain Preserve, LLLP v. Commissioner*, 151 T.C. 247 (2018), *aff'd in part, vacated in part, rev'd in part*, 978 F.3d 1200 (11th Cir. 2020), we concluded that the easement was not a "qualified real property interest" within the meaning of section 170(h)(2)[2] because the restrictions it imposed on the partnership's use of the property were not "granted in perpetuity." We also concluded that petitioners were not subject to gross valuation misstatement penalties under section 6662(a), (b)(3), (e), and (h) for the years in issue because respondent had not met his burden of demonstrating compliance with the supervisory approval requirement of section 6751(b). We interpreted precedents of this Court to have established that the written supervisory approval required by section 6751(b)(1) had to have been given "before the first communication to the taxpayer that demonstrates that an initial determination [to assess penalties] has been made." *Carter*, T.C. Memo. 2020-21, at *27. We found that the revenue agent who made the initial determination had communicated that determination to petitioners before his supervisor had approved it.

In *Kroner v. Commissioner*, 48 F.4th 1272 (11th Cir. 2022), *rev'g in part* T.C. Memo. 2020-73, the Eleventh Circuit rejected this Court's interpretation of section 6751(b)(1). On the basis of the statute's plain terms, the court concluded that approval of an initial determination to assess penalties is timely as long as it comes before assessment.

Petitioners and respondent appealed the decisions we entered on the basis of our prior opinion. Venue for their appeals was the Eleventh Circuit—the same court that had addressed *Pine Mountain*. On appeal, the parties agreed that the partnership's satisfaction of section 170(h)(2) was "controlled" by that court's decision in *Pine Mountain*, which required reversal of this Court on the issue. *Carter v. Commissioner*, 2020 WL 4232170, at *1.

The Eleventh Circuit viewed the timeliness of supervisory approval of the gross valuation misstatement penalties respondent

---

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect for the years in issue, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*5] determined as having been resolved by *Kroner*. The appellate court therefore reversed our decisions in regard to section 6751(b)(1).

In light of the Eleventh Circuit's opinion, we must accept for purposes of these cases that the easement conveyed by the partnership to NALT was a qualified real property interest within the meaning of section 170(h)(2). In our prior proceedings, however, respondent had raised other issues regarding the qualification of the contribution for a deduction under section 170. Given our conclusion in regard to section 170(h)(2), we had found it unnecessary to resolve those other issues. On appeal, petitioners asked the Eleventh Circuit to resolve the remaining issues concerning the partnership's entitlement to a deduction. The court declined to do so. As it had in *Pine Mountain*, the Eleventh Circuit viewed remand on those issues as appropriate to give this Court the opportunity to do the required statutory "heavy lifting." *Carter v. Commissioner*, 2022 WL 4232170, at *1.

## FINDINGS OF FACT

*Dover Hall*

In 2005, Dover Hall Planation, LLC (then owned entirely by Mr. Carter) purchased the Dover Hall property, a 5,245.06-acre tract of land in Glynn County, Georgia. The Dover Hall property is bounded on three of its four sides by waterways, including Green Creek. In April 2009, petitioner Ralph Evans purchased a 50% interest in the partnership for $29,428,027. In a stipulation executed in April 2017, the parties agreed that "[t]he 5,145.06 acre tract of land known as Dover Hall is the only asset owned by Dover Hall Plantation, LLC."[3]

*Initial Documentation; Approval of Gift by NALT Board*

Stephen Lee Echols, a conservation biologist for NALT, visited the Dover Hall property in October 2011 "to make sure it qualified for the conservation purposes and to document the conditions of the property." Petitioners' counsel asked Mr. Echols to "explain for the Court" what he did "in this case to accomplish" the requirement in the regulations to document the property's condition. Mr. Echols responded:

> In the year of 2011, I visited the property on October 1, October 19, and then for a half-day on October 20. I took

---

[3] In May 2006, Dover Hall Plantation, LLC contributed 100 acres of the Dover Hall property to a community foundation.

**[*6]**   photos.  I took notes.  I documented the condition of the property, the important conservation features of the property, and I provided documentary photographs and description that support the conservation values that I researched.

On December 9, 2011, Mr. Echols presented to NALT's board the materials he had assembled.  At a meeting on that day, NALT's board approved acceptance of the easement.

*Grant of Easement; Easement Deed*

On December 27, 2011, the partnership conveyed to NALT an easement over 500 acres at the western edge of the Dover Hall property.  The deed of easement restricts the use of the covered property and, among other things, generally prohibits the construction or occupancy of any dwellings.  The deed lists as the easement's conservation purposes (1) the preservation of a relatively natural habitat of fish, wildlife, or plants or similar ecosystem, and (2) preservation of the covered property as an open space that will provide a significant public benefit by (a) providing scenic enjoyment to the general public and (b) advancing a clearly delineated government conservation policy.

Section 2.3 of the easement deed requires the partnership to prepare, within 24 months of the easement's recording, "a plan for management and growth of forest in the Conservation Area[4] (the 'Forest Management Plan')."  The partnership had to provide the Forest Management Plan to NALT and obtain its written approval of the plan.

In Article 3 of the easement deed, the partnership reserved specified rights.  For example, section 3.1 of the deed allows the partnership to construct one single-family dwelling and accessory structures within each of 11 "Building Areas" of up to two acres.  Section 3.1.1 provides: "The location and dimensions of each of the Building Areas shall be subjected to the review and approval of Holder [that is, NALT].  The location of the Building Area must not, in Holder's judgment, directly or indirectly result in any material adverse effect on any of the Conservation Purposes."

---

[4] The easement deed defines the term "Conservation Area" to mean a specified 500-acre portion of the Dover Hall property.

**[*7]** Section 3.2 allows the partnership to construct roads or driveways to provide access to the Building Areas. Section 3.1.2 provides:

> The location and dimensions of the roads and driveways described in Section 3.2 shall be subjected to the review and approval of Holder. The location of the roads and driveways must not, in Holder's judgment, directly or indirectly result in any material adverse effect on any of the Conservation Purposes or the restoration and management plan prepared in accordance with this Section.

Section 3.9 provides:

> Owner may construct nine (9) docks, and walkways and pathways to such docks, for personal, common or shared use. . . . The location and design of each such dock, walkway and pathway shall be as approved by Holder prior to construction. Each dock must be constructed and placed in a manner and location as will have no material adverse [e]ffect upon the Conservation Values[5] or the Conservation Purposes, including sensitive elements of the ecosystem such as rare species nesting and foraging habitat, rare plant populations or exemplary natural communities.

Section 3.21 allows the partnership to "cut and remove trees in accordance with the Forest Management Plan approved by Holder in accordance with Section 2.3."

> Section 3.25.2 provides that NALT

> must be satisfied, as evidenced by its prior written approval of [the partnership's] exercise of a Reserved Right, that any use or activity done in the exercise of the Reserved Right will meet the requirements and conditions for such Reserved Rights and will have no material adverse effect on the Conservation Purposes or on the significant

---

[5] The easement deed uses the term "Conservation Values" to refer to "the features of the Conservation Area having ecological and scenic significance."

[*8]  environmental features of the Conservation Area described in the Baseline Documentation.[6]

Section 6.18 of the deed sets forth warranties by the partnership (as Owner) to NALT (the Holder).  Section 6.18.1 states: "Owner has received and fully reviewed the Baseline Documentation in its entirety." Section 6.18.2 states that the Baseline Documentation includes a "Naturalist's Report on the Conservation Area," an "Environmental Conditions Map of the Conservation Area," "Photographs of current site conditions on the Conservation Area," a "Narrative description of the significant ecological and other conservation values and characteristics of the Conservation Area," and a "Topographic Map of the Conservation Area."

In section 6.18.3, the Owner represents to the Holder: "The Baseline Documentation is an accurate representation of the condition of the Conservation Area, subject to supplementation and amendment by mutual agreement of the Owner and Holder."

The easement deed was signed by petitioner Nathaniel Carter, as general manager of the partnership, and by Andrew L. Johnson, NALT's president.

*Mr. Echols's "Spring Review" and Final Documentation*

Mr. Echols compiled further documentation of the condition of the Dover Hall property in spring 2012.  As he explained:

> It was customary at the time of this easement for us to take the bulk of the information during the year of recording and then do a follow-up spring survey, because we're often visiting the property late in the year, and we want to provide a full ecological picture of the property.  So the baseline documentation included information from 2011 and 2012, but most of it was taken in 2011.

The record includes a document titled "Baseline Documentation." That document includes sections titled "Existing Conditions Report,"

---

[6] The easement deed uses the term "Baseline Documentation" to refer to "the reports, plans, photographs, documentation, and exhibits assembled by, and retained in the offices of, [NALT] . . . pursuant to 26 CFR §170A-14(g)(5), which describes [specified] Conservation Values of the Conservation Area."

[*9] "Photographic Documentation," and "Supportive Mapping." The Existing Conditions Report provides an 8-page textual description of the Dover Hall property. The "Photographic Documentation" section includes 23 "photoprints." The "Supportive Mapping" section includes 6 pages of maps. Exhibit 51-J also includes an "Owner Acknowledgement," in which representatives of the partnership and NALT attest that the documentation accurately represents "the physical condition of the Conservation Area."[7] The Owner Acknowledgement identifies December 30, 2011, as the "Date Recorded."[8] It provides no other dates. In particular, it does not identify the date on which it was signed.

According to Mr. Echols, "information" about the Dover Hall property "was available to [NALT's] board and to the client [presumably, the partnership] prior to recording," but the final documentation "wasn't assembled until after the spring review of the property." "[T]he full baseline in its entirety," he said, "was not assembled until the spring."

When asked by petitioners' counsel whether he had "assemble[d] the information required by the regulations prior to 2011," Mr. Echols responded: "Yes I did." The information he assembled in 2011 "include[d] photos, a description of the property, and . . . necessary maps."

*Tax Reporting of Easement Contribution*

On its 2011 tax return, the partnership claimed a charitable contribution deduction of $14,175,000 for the donation of the easement to NALT.[9] On his 2011 Federal income tax return, Mr. Evans, a resident of Georgia when he filed his Petition, claimed a charitable contribution deduction equal to his 50% share of the deduction reported by the partnership. The Carters, also Georgia residents when they filed their

---

[7] The Owner Acknowledgement was signed on NALT's behalf by Steven W. Carter, its Stewardship Coordinator. Mr. Echols explained that "it's customary for [him] not to sign" acknowledgments.

[8] Mr. Echols confirmed that "Date Recorded" refers to the date on which the easement deed was recorded.

[9] The amount of the contribution reported by the partnership is supported by an appraisal prepared by Claud Clark III. Respondent agrees that Mr. Clark's appraisal was a "qualified appraisal" within the meaning of section 170(f)(11)(E)(i). In arriving at his estimate of the fair market value of the easement conveyed by the partnership to NALT, Mr. Clark determined that the Dover Hall property was worth $48,217,017 before the easement grant.

[*10] Petition, reported Mr. Carter's 50% share of the partnership's deduction on line 17 of Schedule A, Itemized Deductions, of their 2011 return, but their deduction was limited by section 170(b)(1)(A). The Carters reported carryover deductions from 2011 on their 2012 and 2013 returns.

*Notices of Deficiency*

In notices of deficiency issued on August 18, 2015, respondent disallowed in full the charitable contribution deduction Mr. Evans claimed for 2011 and the charitable contribution deductions the Carters claimed for 2011, 2012, and 2013 as a result of the partnership's grant of the easement to NALT. The notices of deficiency also determined gross valuation misstatement penalties and other accuracy-related penalties for the taxable years in issue.

*Expert Testimony Regarding Impact of Reserved Rights*

Petitioners presented testimony from three expert witnesses concerning the impact on the partnership's exercise of its reserved rights: Christopher Wilson, an expert in conservation biology; Stuart Sligh, a wildlife biologist and environmental consultant; and Mr. Echols, the conservation biologist from NALT.

*Christopher Wilson*

In his written report, Mr. Wilson stated:

Clearly there will be a direct impact to habitats on the conservation area where permanent structures and new roads are built. However, the total footprint of structures permitted by the easement appears to be quite low with respect to the size of the conservation area as a whole. What is perhaps the most important provision in the reserved rights is the requirement for NALT approval regarding the location and dimensions of the building envelopes, structures, roads, and docks. This allows NALT biologists the opportunity to gather additional information regarding the locations of sensitive habitats and rare species on the property, and avoid impacts sensitive areas [sic] in order to maximize the outcome for natural habitat conservation. For example, if during the drafting of the easement the building areas would have been excluded from the conservation area, then NALT would have had

**[*11]** much less time to study the property, and no opportunity to incorporate new knowledge regarding rare species and habitats locations into the layout of building envelopes and structures.

> Given that: 1) the intent of the document is to protect natural habitat and wildlife species, particularly those considered rare or imperiled, or otherwise of conservation concern, as stated in the conservation purposes and whereas clauses; 2) the total area impacted by new permanent structures permitted in the reserved rights is so low relative to the size of the conservation area as a whole; and 3) that [sic] NALT has approval over the location and dimensions of [the] building envelopes, structures, and roads, it is my opinion that the easement provides for the protection of the conservation values in perpetuity.

Mr. Wilson acknowledged that his report does not express an opinion as to whether the uses of the Dover Hall property retained by the partnership impaired the easement's conservation purposes. When asked by the Court for his opinion on that point, Mr. Wilson responded: "The reserved rights would have some impact on the . . . conservation values or purposes." But Mr. Wilson also agreed with the Court that it would be appropriate to draw from his report the conclusion that the easement's conservation values "are protected in perpetuity by the easement, not withstanding [sic] the interests retained by the donor, because the values would not be significantly diminished by the retained interests." When, however, the Court asked whether it would be a "correct assessment of [his] opinion" that "the retention of the right to develop eleven lots and the docks and put in the various roads will not significantly diminish the . . . conservation value," Mr. Wilson responded that he was not sure. He then stated his belief that "the conservation priority bird species that [he] mentioned in [his] report would still be there and still have plenty of valuable habitat, even if the reserved rights were exercised." The species would have "slightly less" habitat but still enough. Mr. Wilson agreed with the Court that the partnership's exercise of its reserved rights would "diminish [the conservation value] but not significantly."

Mr. Wilson confirmed that the extent to which the building of homesites and associated roads would impair the easement's conservation values would depend on where they were placed. He said

[*12] the docks could have "a minor impact," depending on their location. He added that the docks' level of impact "may be so low that it's inconsequential to the use of that habitat by th[e] priority bird species."

Mr. Wilson opined that the effect of article 3 of the easement deed on conservation values was not entirely negative. Instead, he said the rights reserved in article 3 had a mixed effect, in addition to allowing the building of homes, docks, and roads, the deed also "allows for forestry management." The forestry management allowed "actually helps maintain and improve habitat for some of those species, and if that wasn't there . . . the value of that land would significantly be diminished, if there was not ongoing maintenance."

*Stuart Sligh*

Mr. Sligh testified that he expected NALT, in exercising its "oversight to locate the homesites," would "try to site a two-acre homesite with a few significant trees." Mr. Sligh also opined that the addition of nine docks on the shoreline of Green Creek would "slightly decrease" the conservation benefits of the shoreline. He based that view on the effect of the docks on the fish habitat, not on the visual aspects of the shoreline. He also said that, while no docks would be better than nine, "a few private, single-family docks really has very little negative impact, in my opinion."

In his written report, Mr. Sligh used the term "edge effect" to refer to "the boundary where two habitat types meet and wildlife diversity increases." He wrote:

> These edges usually support a diversity of plant species which could include soft-mast species such as berries and fruits that would not normally survive in a forested environment, particularly if burned on a regular rotation. Managing edges can increase wildlife diversity, and in many cases, wildlife managers prescribe specific edge management plans for landowners to increase wildlife populations and diversity. It is my opinion that an allowance of 11 small home sites with limited clearing within the CE [conservation easement] area could potentially increase the edge effect of the overall habitat without negatively impacting the forest community or wildlife species diversity.

[*13] Mr. Sligh concluded that, in his opinion, "the owner's retained rights on the 500-acre CE area will not diminish the overall Conservation Values."

*Lee Echols*

Mr. Echols's written report states that, "by allowing only a handful of homes on an environmentally sensitive 500-acre tract that borders Green Creek," the easement helps to accomplish goals laid out in a county development plan. Echoing Mr. Sligh, Mr. Echols wrote that the retained building rights "would only be allowed in planted pine stands." In his trial testimony, Mr. Echols explained that "the pine plantation is the least natural part of the property, and thus the most appropriate place to locate those homesites."

Mr. Echols' written report states his opinion that

the allowance of only 9 carefully selected and constructed dock sites along approximately 4 miles of tidal creek would have [a] negligible effect on the scenic values of the property. As compared to conventional waterfront developments, the number of allowable docks is residual and of no consequence to either scenic or relatively natural habitat purposes.

The report concludes as follows:

In this report, I have attempted to substantiate the many significant conservation attributes of Dover Hall, as well as provide evidence that the allowable reserved rights do not adversely affect the perpetuity of the Conservation Area. The residual allowable home sites and associated structures are both minimal compared to the overall acreage of the property, and very minimal when compared to other developed coastal properties. Additionally, these reserved rights are highly constrained in their location and design via the carefully crafted conservation easement language. This property confers significant public benefit in the form of protected high quality natural habitats, intact working forest lands, scenic views, and support of prominent governmental conservation policies.

In his oral testimony, Mr. Echols opined that the 11 homesites would impair the easement's conservation value "to a negligible degree."

**[*14]** He also said that homesites can be "positive" because they "limit[] encroachment from people creating ATV trails, from illegal hunting." Property owners can "get involved in restoration activities on the property out of their own interest" and "sometimes will find rare species" that NALT did not identify.

Mr. Echols expected that NALT would "strive" to meet the goal that "no portion of any house would be visible from" Green Creek. He viewed that goal to be "practical" "because the natural vegetation along the creek forms a barrier."

Mr. Echols admitted that the docks would impair the scenic view conservation value, but the effect, he said, would again be "negligible." He suggested that nine docks along a four-mile tidal creek would not stop people from enjoying it. If the docks had existed before the grant of the easement, he said, NALT "wouldn't have any problem claiming scenic."

*Expert Testimony on Valuation*

*Van Sant and Wingard*

Petitioners offered testimony of Martin Van Sant and Thomas Wingard (Van Sant and Wingard). Although respondent accepted Van Sant and Wingard as experts in the valuation of real property, he challenges the admissibility of their report for the reasons explained in Part V.A.1 below.

*Responsibility for Conclusions and Analysis*

The written report of Van Sant and Wingard that petitioners submitted as the appraisers' direct testimony does not identify specific opinions with either of its coauthors, but the report includes a certification by each of them that "[t]he reported analyses, opinions and conclusions . . . are my personal, impartial and unbiased professional analyses, opinions and conclusions."

During Mr. Wingard's voir dire testimony at trial (without Mr. Van Sant present), he stated that both he and Mr. Van Sant were "involved in all the processes" of preparing the report. Therefore, "every section of the report was done in concert with the other." "In essence," Mr. Wingard said, he and Mr. Van Sant "have coauthored th[e] report." Mr. Van Sant agreed that, while one or the other may have typed different sections, they each took "ownership" of the whole report.

[*15] Mr. Wingard acknowledged disagreements between them in the report's preparation but testified that they had worked out those disagreements and arrived at mutually agreeable conclusions.

*Van Sant and Wingard's Preeasement Value*

Van Sant and Wingard valued the easement by comparing the value of the Dover Hall property before the grant of the easement to its value thereafter. To determine the preeasement value, they employed the "sales comparison approach," using sales of six properties they viewed as generally comparable. They adjusted the sales price in each of the comparable sales on the basis of their judgments on the effects of differing circumstances, including the physical characteristics of the properties in issue, the nature of the sale, and prevailing market conditions at the time of the sale compared to those of December 30, 2011.[10] In the case of three properties that they admitted had no "water influence," their adjustments took that factor into account.

Van Sant and Wingard describe their "Comparable Land Sale No. 1" as a "forced sale under forbearance by . . . [the seller's] creditor." They explain that they considered the sale a forced sale because of the seller's financial condition "and the pressure from" the seller's creditor. The adjustments they made to the sales price of Comparable Land Sale No. 1 thus included a positive 50% adjustment to account for the conditions of sale (i.e., in the absence of other adjustments, their adjusted sales price for that property would have been 1.5 times the actual price at which the property sold).

After making adjustments for the differing circumstances, the sales prices per acre in the comparable sales ranged from $5,550 to $13,608. In arriving at a value per acre for the Dover Hall property, Van Sant and Wingard gave disproportionate weight to two of the six sales that involved coastal Georgia properties. The adjusted sales prices of those two properties ($5,550 and $11,404 per acre) had an arithmetic mean of $8,477. By contrast, the arithmetic mean of the adjusted sales prices in all six sales was $10,595 per acre. On the basis of those data, Van Sant and Wingard concluded: "A reasonable and justifiable correlation among the six sales may suggest $9,000/acre, slightly above the arithmetic mean displayed by the two Coastal Georgia sales."

---

[10] Van Sant and Wingard valued the easement as of December 30, 2011, which was the date on which the easement, granted three days earlier, was filed and recorded.

[*16] Applying that per-acre value to the acreage of the Dover Hall property (5,145.06), Van Sant and Wingard arrived at a total preeasement value of $46,305,540 (5,145.06 × $9,000), which they rounded to $46,300,000.

*Van Sant and Wingard's Posteasement Value*

Van Sant and Wingard were unable to find sales of properties comparable to the Dover Hall property after the grant of the easement (that is, sales of similar properties subject to similar easements). "After an extensive search," they wrote, data regarding sales of comparable properties were "not . . . available." Therefore, they simply adjusted their preeasement value by the easement's estimated impact. In arriving at an estimate of the percentage reduction in the value of the property resulting from the easement, they considered the easement's effects on various attributes. They determined that the easement reduced the number of residential units that could be developed on the property by 9.52%. They also noted that the easement covered 9.72% of the total acres of the Dover Hall property. Relying on Mr. Sligh's report, they determined that the easement would reduce the number of docks that could be built on adjacent waterways by 20.25%. "Based on the percentages of those elements of comparison affected by the encumbrance," they wrote, "it was determined a reasonable effect of the easement . . . may approach 30.0%." They concluded: "This adjustment does not in anyway [sic] suggest mathematical exactness, but does appears [sic] reasonable in light of the quality of this area of the total property affected by the easement restrictions."

At trial, Mr. Van Sant and Mr. Wingard each suggested that they had arrived at their 30% adjustment by summing the percentage reductions in various attributes and rounding the result. Mr. Van Sant referred to the percentage of total acreage covered by the easement, the reduction in allowable residential units, and the percentage reduction in water footage (16%), noting that their sum was "close to 30 percent" (9.72%, 9.52%, and 16% sum to 35.25%). By contrast, Mr. Wingard used the percentage reduction in docks instead of the reduction in water frontage. He noted that 9.52%, 9.72%, and 20.25% sum to "about 39 percent" and described the 30% adjustment he and Mr. Van Sant made as "a little bit less than that."

Neither Mr. Van Sant nor Mr. Wingard explained why they simply summed the percentage reductions in various attributes, without taking into account the proportion of the value of those attributes to the

[*17] total value of the Dover Hall property. When the Court asked Mr. Wingard "what on earth would make you combine" the percentages, his only answer was: "[W]e thought that was a reasonable summation."

In an apparent test of the reasonableness of their 30% adjustment, Van Sant and Wingard considered the sales of properties subject to easements in their entirety. To determine the impact of those easements on the values of the properties, they had to estimate what each property would have been worth if it had not been encumbered. On the basis of those estimates, they determined that the easements reduced the values of the properties by an average of 83.28%. In light of that number, they reasoned, "the determination of a 30% adjustment for the subject property's loss of certain rights on 500.00 acres appears reasonable and justifiable."

Thus, Van Sant and Wingard purported to recompute the adjusted sales price of each of their six comparable properties by adding an additional adjustment of negative 30%. As recomputed, the adjusted sales prices ranged from $4,056 per acre to $9,720 per acre.[11] That range produced an arithmetic mean of $7,343 per acre.[12] On the basis of those data, Van Sant and Wingard concluded: "A reasonable and correlated value for the subject after the placement of a conservation easement on 500.00 acres is $7,000 per acres [sic]."

---

[11] Van Sant and Wingard's computation for purposes of their "after" analysis of the adjusted price for their Comparable Land Sale No. 1, which provided the low end of the range of comparable property values, reflects an arithmetic error. In their "before" analysis, they made a net adjustment of positive 30% for the physical characteristics of the property sold in Comparable Land Sale No. 1. Their "after" analysis made the same adjustments as the "before" analysis with the addition of a negative 30% adjustment to account for the effects of the easement. Thus, the net adjustment for the physical characteristics for Comparable Land Sale No. 1 in the "after" analysis should have been zero. Instead, Van Sant and Wingard made a negative 5% net adjustment due to an error in adding up the separate adjustments. Had they made no net adjustment to Comparable Land Sale No. 1 for purposes of the "after" analysis (with the negative 30% adjustment for the easement offsetting the 30% positive adjustment for the other factors considered), the adjusted sales price for Comparable Land Sale No. 1 in Van Sant and Wingard's "after" analysis would have been $4,269 per acre (equal to the $5,550 sales price used in the "before" analysis divided by 1.3).

[12] Correcting for the arithmetic error in the computation of the adjusted sales price for Van Sant and Wingard's Comparable Land Sale No. 1 would have produced an arithmetic mean of $7,417. Because the adjusted sales price for Comparable Land Sale No. 1 was the low end of the range of values, the error in computation had no effect on the median.

[*18] Thus, in their "after" analysis, Van Sant and Wingard gave equal weight to all six comparable properties, while their "before" analysis gave disproportionate weight to the two comparable properties on the Georgia coast. Their report fails to explain that inconsistency.

Using a value of $7,000 per acre, Van Sant and Wingard determined that, after the easement grant, the Dover Hall property was worth $36,015,420 ($7,000 × 5,145.06 acres), which they rounded to $36,000,000. Comparing that amount to their preeasement value of $46,300,000, they concluded that the easement was worth $10,300,000 on December 30, 2011 ($46,300,000 − $36,000,000).

*Zac Ryan*

Respondent offered testimony of Zac Ryan, whom petitioners accepted as an expert appraiser of real property.

*Mr. Ryan's Preeasement Value*

Like Van Sant and Wingard, Mr. Ryan valued the Dover Hall property as a whole before and after the grant of the easement. Also like Van Sant and Wingard, Mr. Ryan determined Dover Hall's preeasement value by reference to sales of generally comparable properties. He considered four of them, which he classified as either superior or inferior to the Dover Hall property (taking into account, among other things, the water features of each property). Each of his four comparable properties had merchantable timber. For three of them, he adjusted the sales price per acre at which the property sold by subtracting an estimate of timber value. (For the other comparable property, he was unable to obtain an estimate of timber value and left the sales price unadjusted.) The adjusted sales prices of the properties he considered inferior to the Dover Hall property ranged from $936 to $1,201 per acre. The one property he considered superior to Dover Hall had a sales price of $3,116 per acre. He therefore concluded that the value of the Dover Hall property "should fall . . . [above] $1,201 per acre (the highest inferior indicator) but below $3,116 per acre (the lone superior indicator)." Because of the "overall amenity and aesthetic features" of the Dover Hall property, Mr. Ryan chose a per-acre value of $3,000, toward the upper end of the range. He thus valued the Dover Hall property before the granting of the easement at $15,435,000 ($3,000 per acre × 5,145 acres).

In characterizing the "conditions of sale" for each of his four comparable properties, Mr. Ryan described the transaction as "arm's

[*19] length" but noted that two of the four transactions were sales out of foreclosure. At trial, Mr. Ryan testified that he knew that the seller in a third sale had been in bankruptcy. The sellers in the fourth of Mr. Ryan's comparable sales were limited liability companies that had some affiliation with a family that owned another property through an entity that was in receivership. At trial, Mr. Ryan admitted that he should have made clear that the sellers in all four of the transactions were in adverse financial circumstances. Mr. Ryan said that, as part of his research, he spoke with the parties involved in the transactions and confirmed "that the properties had received their full exposure to the market and had achieved prices that were consistent with everything they could have achieved under prevailing market conditions at that point in time."

Mr. Ryan admitted that, on a tour of the Dover Hall property conducted by a caretaker (and attended by petitioners' and respondent's counsel), "we didn't really venture into the easement area too terribly far, because . . . [the caretaker] couldn't tell us where the easement was exactly." Mr. Ryan admitted that he did not remember seeing Green Creek on that visit. But he came back to the property and observed Green Creek from a highway that crosses it.

*Mr. Ryan's Posteasement Value*

Mr. Ryan was unable to find appropriate comparable properties to value Dover Hall as a whole after the easement. The only reference properties he found were subject to easements in their entirety. Therefore, he used those properties to value the 500 acres of Dover Hall subject to the easement and used his $3,000-per-acre value from his before analysis to value the remainder of the Dover Hall property after the granting of the easement.

Mr. Ryan identified five comparable properties to value the 500 acres of Dover Hall subject to the easement, four of which included merchantable timber. After adjustment for the timber value as appropriate, the sales prices for the five comparable properties ranged from $491 to $1,587 per acre. Again, Mr. Ryan classified each comparable property as either superior or inferior to the Dover Hall property, taking into account the property's water features and other factors. The adjusted sales prices for the inferior properties ranged from $491 to $671 per acre. The adjusted sales prices of the superior properties ranged from $1,517 to $1,587 per acre. Therefore, Mr. Ryan concluded that "the value of the land in the conservation easement area

[*20] should fall above $671 per acre (the highest inferior indication) but below $1,517 (the lowest superior indication)." In determining a value within that range, he acknowledged the right of the partnership to build 11 homes but found that factor offset by what he described as "extremely limited market demand for those rights as of the effective date of value." Mr. Ryan therefore chose a value in the middle of the range suggested by the sales of his comparable properties: $1,000 per acre. He thus valued the 500 acres of the Dover Hall property subject to the easement at $500,000 (500 × $1,000) and valued the property as a whole after the grant of the easement at $14,435,000 ($500,000 + (5,145 acres − 500 acres) × $3,000 per acre). Comparing his before and after values, Mr. Ryan determined that the easement was worth $1,000,000 on December 30, 2011 ($15,435,000 − $14,435,000, or 500 acres multiplied by the $2,000 reduction in value per acre resulting from the easement).

## OPINION

I. *The Applicable Law in General*

Section 170(a)(1) allows a deduction for "any charitable contribution . . . payment of which is made within the taxable year." Section 170(c) defines the term "charitable contribution" to mean "a contribution or gift to or for the use of" a specified organization.

As a general rule, a taxpayer is not allowed a deduction for a contribution of part of the taxpayer's interest in a property. *See* § 170(f)(3). That general rule does not apply, however, to "a qualified conservation contribution." § 170(f)(3)(B)(iii).

Section 170(h)(1) defines "qualified conservation contribution" to mean "a contribution—(A) of a qualified real property interest, (B) to a qualified organization, (C) exclusively for conservation purposes."[13] The term "qualified real property interest" includes "a restriction (granted in perpetuity) on the use which may be made of . . . real property." § 170(h)(2)(C). As pertinent here, section 170(h)(4)(A) defines the term "conservation purpose" to mean (i) the preservation of land for recreational or educational uses by the general public, (ii) "the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem," (iii) "the preservation of open space" that "will yield

---

[13] Respondent does not dispute NALT's status as a "qualified organization," as defined by section 170(h)(3).

**[\*21]** a significant public benefit," or (iv) "the preservation of an historically important land area or a certified historic structure." Section 170(h)(5)(A) provides: "A contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity."

Treasury Regulation § 1.170A-14(g)(5)(i) provides:

In the case of a donation made after February 13, 1986, of any qualified real property interest when the donor reserves rights the exercise of which may impair the conservation interests associated with the property, for a deduction to be allowable under this section the donor must make available to the donee, prior to the time the donation is made, documentation sufficient to establish the condition of the property at the time of the gift. Such documentation is designed to protect the conservation interests associated with the property, which although protected in perpetuity by the easement, could be adversely affected by the exercise of the reserved rights. Such documentation may include:

 (A) The appropriate survey maps from the United States Geological Survey, showing the property line and other contiguous or nearby protected areas;

 (B) A map of the area drawn to scale showing all existing man-made improvements or incursions (such as roads, buildings, fences, or gravel pits), vegetation and identification of flora and fauna (including, for example, rare specifies locations, animal breeding and roosting areas, and migration routes), land use history (including present uses and recent past disturbances), and distinct natural features (such as large trees and aquatic areas);

 (C) An aerial photograph of the property at an appropriate scale taken as close as possible to the date the donation is made; and

 (D) On-site photographs taken at appropriate locations on the property. If the terms of the donation contain restrictions with regard to a particular natural resource to be protected, such as water quality or air quality, the condition of the resource at or near the time of the gift must be

**[\*22]** established. The documentation, including the maps and photographs, must be accompanied by a statement signed by the donor and a representative of the donee clearly referencing the documentation and in substance saying "This natural resources inventory is an accurate representation of [the protected property] at the time of the transfer.".

## II. *Identification of Remaining Issues*

In an Order issued in January 2023, following the Eleventh Circuit's remand of these cases, we directed the parties to "file reports stating their views as to the actions this Court should take on remand." In the Status Report he submitted in response to that Order, respondent renewed two arguments he had made on brief that, if accepted, would require disallowance of the partnership's deduction. First, respondent argues, "petitioners failed to make available to the donee, prior to the grant of the easement, documentation sufficient to establish the condition of the property as required by Treas. Reg. § 1.170A-14(g)(5)(i)." Respondent refers to testimony by "petitioners' own witness" to the effect that "the baseline documentation was not assembled until months after donation of the easement, making compliance with the requirement impossible."

Respondent invokes "[a] second, independent problem with petitioners' conservation easement" that, in his view, "also requires disallowance of the deduction." "[T]he deed of easement's reserved rights," respondent argues, "allow inconsistent uses which impair the conservation interests that the easement seeks to protect." Respondent alleges that the allowance of inconsistent uses violates Treasury Regulation § 1.170A-14(e)(2).[14] Again, respondent claims that testimony of petitioners' own witnesses supports his argument. He claims that three expert witnesses called by petitioners "agreed that the exercise of the reserved rights would impair, injure, and diminish the conservation interests that the easement sought to protect."

In his Status Report, respondent asks us to adopt as "reasonable and well-supported" Mr. Ryan's conclusion "that the easement was worth $1,000,000 at the time of the donation." Respondent also renews

---

[14] Treasury Regulation § 1.170A-14(e)(2) provides as a general rule that "a deduction will not be allowed if the contribution would accomplish [an] enumerated conservation purpose[] but would permit destruction of other significant conservation interests."

[*23] an argument he made on brief that we should exclude Van Sant and Wingard's report. Even if we consider Van Sant and Wingard's report, respondent argues, we should give it "little, if any, weight because its conclusions are contradictory and unsupported." On the premise that the easement's "true value" was $1,000,000, respondent concludes that petitioners "are subject to a forty percent gross valuation misstatement penalty."

In their Status Report, petitioners largely agree with respondent's list of issues for us to resolve on remand. They ask that we decide "the remaining issues relating to the validity of the conservation easement, including whether the conservation easement protects the conservation purposes in perpetuity under I.R.C. § 170(h)(5)(A) and whether there was adequate baseline documentation of the property at the time of the donation." Petitioners' nonexclusive list leaves open the possibility of additional issues, but neither party has identified any other issues regarding the partnership's compliance with section 170(h) and its accompanying regulations. Petitioners also raise the prospect of a reasonable cause defense to valuation misstatement penalties, which respondent did not acknowledge in his Status Report.

We view as follows our tasks on remand. First, we have to decide whether the documentation that the partnership made available to NALT, before the contribution, concerning the condition of the Dover Hall property satisfied the requirements of Treasury Regulation § 1.170A-15(g)(5)(i). If so, we must go on to decide whether the partnership's reservation of limited rights to develop the Dover Hall property violates the requirement of section 170(h)(5)(A) that the conservation purposes of a qualified conservation contribution be "protected in perpetuity." We will then need to determine the easement's value. If we conclude that the partnership satisfied the so-called "baseline documentation" requirements of Treasury Regulation § 1.170A-14(g)(5)(i) and that its reserved rights do not violate section 170(h)(5)(A), the partnership will be entitled a charitable contribution deduction measured by the easement's value. And the value of the easement will be relevant for the purpose of determining petitioners' liability for valuation misstatement penalties regardless of the partnership's entitlement to a charitable contribution deduction. Finally, should we determine that the value the partnership placed on the easement in reporting its charitable contribution deduction resulted in a substantial valuation misstatement, within the meaning of section 6662(e)(1), but not a gross valuation misstatement, within the meaning

**[*24]** of section 6662(h)(2), we will need to consider petitioners' reasonable cause defense to the otherwise applicable penalty.

III.  *Baseline Documentation*

A.  *Failure of Strict Compliance*

Although Treasury Regulation § 1.170A-14(g)(5)(i) requires the donor of a qualified real property interest who reserves rights in the donated property to make "sufficient" documentation available to the donee before a gift, the regulation provides little or no guidance on how to assess the sufficiency of a given quantum of documentation. Treasury Regulation § 1.170A-14(g)(5)(i)(A) through (D) lists items that "may" be included in the documentation. As petitioners observe, however, the listed examples are merely illustrative.

The absence of guidance on the sufficiency of documentation— and the practical reality that the Internal Revenue Service and the courts are not particularly competent to assess it—highlight the importance of the signed written statement requirement provided in Treasury Regulation § 1.170A-14(g)(5)(i)(D). The parties' interests in regard to the quantum of available documentation are not likely to be in full alignment. (The donee would generally prefer more documentation; the donor might prefer less, to give it more flexibility in the exercise of its reserved rights.) Therefore, if the parties jointly agree that the baseline documentation made available to the donee before the gift accurately represents the property's condition at that time, their agreement can be taken as validation that the documentation is sufficient to enable the donee to effectively monitor the donor's exercise of its reserved rights in the property.

Although the regulation does not explicitly state a deadline for the signed written statement, it does provide that the required statement must "accompany" the documentation to which it attests. And Treasury Regulation § 1.170A-14(g)(5)(i) requires the donor to make that documentation available to the donee "prior to the time the donation is made." Therefore, by implication, the regulation requires the parties to sign the statement before the date of the gift.

The "Baseline Documentation Acknowledgment" included in the record does not indicate when it was signed. The only date given on the acknowledgment is the date of recording of the easement deed. Thus, the acknowledgment cannot have been signed until on or after the

**[\*25]** recording date of December 30, 2011, which, in turn, was after the date of the gift.

Moreover, the Baseline Documentation Acknowledgment states only that the that the documentation to which it was attached, which was not assembled in its final form until spring 2012, accurately represented the physical condition of the Dover Hall property at some unspecified time. It does not evaluate the sufficiency of the documentation by reference to the property's condition at the time of the gift. The acknowledgment therefore does not evidence the mutual agreement of the partnership and NALT that the documentation made available to NALT *before* the date of the gift was sufficient to establish the condition of the property *at that time.*

Petitioners argue that the signed written statement requirement was satisfied by the representations set forth in section 6.18.2 and 6.18.3 of the easement deed, which was signed by Nathaniel Carter, as general manager of the partnership, and by Andrew L. Johnson, NALT's president. Those signatures, petitioners reason,

> confirm[ed] that [Messrs. Carter and Johnson] had reviewed the documentation required by Treas. Reg. § 1.170A-14(g)(5)(i)(A)-(D), including on-site photographs and Mr. Echol's [sic] naturalist's report on the conservation area showing the condition of the property at the time of the donation and confirming that the documentation was an accurate representation of the condition of the property at the time of the donation.

Petitioners interpret the representations as referring "to Mr. Echols [sic] work-product." In the representations, they say, Messrs. Carter and Johnson "warrant[ed] that th[e] documents [Mr. Echols compiled] were an accurate representation of the condition of the property at the time of the donation." Thus, petitioners conclude, those documents, and Messrs. Carter and Johnson's warrant of their accuracy, "meet[] the baseline requirements of the regulations, including the requirement of a signed statement."

We do not agree that section 6.18.2 and 6.18.3 of the deed signed by Nathaniel Carter and Mr. Johnson satisfies the signed written statement requirement of Treasury Regulation § 1.170A-14(g)(5)(i)(D). Section 6.18.2 and 6.18.3 sets forth *unilateral* representations made by the partnership to NALT. In section 6.18.3, the partnership represents

**[\*26]** to NALT that the Baseline Documentation accurately represents the condition of the Conservation Area. Mr. Johnson's signature on the deed that includes that representation does not demonstrate that NALT *agreed* that the documentation was accurate. Treasury Regulation § 1.170A-14(g)(5)(i)(D) requires the donor and donee to *jointly* certify the accuracy of clearly referenced documentation. A unilateral certification of documentation, even if that certification accompanies and clearly references the documentation, does not satisfy the signed written statement requirement of Treasury Regulation § 1.170A-14(g)(5)(i)(D).

In short, Treasury Regulation § 1.170A-14(g)(5)(i)(D) requires a representative of the donee to join the donor in executing a signed written statement that attests to the sufficiency of the documentation made available to the donee before the gift. Neither the Baseline Documentation Acknowledgment included with the documentation as supplemented in spring 2012 nor the partnership's unilateral representations to NALT in the easement deed demonstrate strict compliance with the signed written statement requirement of Treasury Regulation § 1.170A-14(g)(5)(i)(D).

B. *Substantial Compliance*

Our conclusion that petitioners have not demonstrated the partnership's strict compliance with the baseline documentation rules does not end our inquiry. As we wrote in the Order in which we requested supplemental briefs, "[a] taxpayer's failure to strictly comply with a rule that is directory rather than mandatory can be excused if the taxpayer substantially complied with the rule."

Our caselaw on the substantial compliance doctrine can be read to suggest a two-step analysis. First, we ask whether the relevant rule is directory or mandatory. If the rule is mandatory, strict compliance is required. *See, e.g.*, *Taylor v. Commissioner*, 67 T.C. 1071, 1077 (1977); *Dunavant v. Commissioner*, 63 T.C. 316, 319 (1974). If the rule is instead directory, a taxpayer's failure to strictly comply may be excused. In those cases, we go on to ask whether the taxpayer's compliance, though imperfect, was at least substantial. *Taylor*, 67 T.C. at 1077–78.

Those two questions—whether a rule is directory or mandatory and whether a taxpayer's compliance was substantial—are closely interrelated. Both aim to implement Congress's intent. In *Sperapani v. Commissioner*, 42 T.C. 308, 331 (1964), we suggested that a rule is mandatory if it "relate[s] to the substance or essence of the statute." And

**[\*27]** in *Smith v. Commissioner*, T.C. Memo. 2007-368, 2007 WL 4410771, at \*19, *aff'd*, 364 F. App'x 317 (9th Cir. 2009), we suggested that a taxpayer's imperfect compliance is nonetheless substantial if it "adequately serve[s] the purposes intended by Congress." *See also Durden v. Commissioner*, T.C. Memo. 2012-140, 2012 WL 1758655, at \*2 (suggesting that a taxpayer's compliance is substantial if it is sufficient to "fulfill[] the essential statutory purpose").

Under a strict, two-step process, if we classified a rule as directory rather than mandatory, we would then ask whether the taxpayer's failures of compliance prevent achievement of the legislative purpose. But the answer to that second question can influence—and even determine—the answer to the first. That a taxpayer's failures of compliance do not prevent achievement of Congress's purpose demonstrates that the rule or rules in question must not go to the substance or essence of the statute—that is, they are directory and not mandatory. In *Vaughan v. John C. Winston Co.*, 83 F.2d 370, 372 (10th Cir. 1936), the Court of Appeals for the Tenth Circuit wrote: "If a requirement is so essential a part of the plan that the legislative intent would be frustrated by a noncompliance, then it is mandatory." The converse should also be true: If noncompliance does *not* frustrate legislative intent, the rule should be classified as directory (and compliance that is sufficient to fulfill legislative intent should be judged substantial).

Petitioners have not demonstrated strict compliance with the baseline documentation rules of Treasury Regulation § 1.170A-14(g)(5)(i) because they have not established that the documentation of the condition of the Dover Hall property made available to NALT before December 27, 2011, was accompanied by the signed written statement required by Treasury Regulation § 1.170A-14(g)(5)(i)(D). The purpose of that requirement, as we understand it, is to ensure that the documentation of the property's condition made available to a donee is sufficient to enable the donee to fulfill its responsibility of preventing the donor from exercising reserved rights in the donated property in a manner that would undermine the gift's conservation purposes. We therefore ask whether the record provides a basis for concluding that, notwithstanding the partnership's failure to have demonstrated strict compliance with the signed written statement requirement, the documentation made available to NALT was sufficient to enable it to fulfill its oversight responsibilities.

**[\*28]** The partnership's failings in regard to baseline documentation are temporal. The record includes a statement, signed by Nathaniel Carter on behalf of the partnership and by NALT's stewardship coordinator, that attests to the adequacy of the documentation available to NALT as supplemented by Mr. Echols's spring review of the property. But the signed written statement included in the record does not attest to the adequacy of the documentation available to NALT before the gift. How significant was the possible delay of four or five months in the completion of the baseline documentation? More to the point, what is the risk that, on the basis of the documentation it had, NALT would have approved the partnership's exercise of a reserved right that it would not have approved if it had had complete documentation in December? Under the circumstances, we do not view that risk to be significant.

Moreover, NALT had substantial documentation concerning the condition of the Dover Hall property before its board approved the gift on December 9, 2011. Mr. Echols visited the property several times in October 2011. During those visits, he took notes and photos to document the property's important conservation features. On the day the board met to approve the gift, Mr. Echols presented to the board the materials he had assembled. At that meeting, the board approved acceptance of the easement. We infer from that chronology that the board wanted to consider the adequacy of Mr. Echols's documentation before granting its approval. And its vote to accept the partnership's gift indicates that the NALT board was satisfied with the documentation then available.

It would be inappropriate to infer the adequacy of documentation of the condition of donated property available to a donee from the donee's acceptance of the gift alone. Making that inference from the mere acceptance of the gift would effectively read the signed written statement requirement out of the regulations. But the record before us provides more than NALT's acceptance of the gift from which to infer the adequacy of the documentation available to NALT before the gift. Again, we know that Mr. Echols had assembled substantial documentation before the gift. According to his testimony, most of the documentation in the final package came from his visits to the property in October 2011. And Mr. Echols provided the then-available documentation to the NALT board on the day the board approved acceptance of the partnership's gift. We thus have stronger grounds for inferring NALT's satisfaction with the available documentation than just the organization's acceptance of the gift.

[*29] Further, we have Mr. Echols's testimony that, in his judgment, the documentation he had assembled before the gift was adequate. At trial, petitioners' counsel asked Mr. Echols whether he had "assemble[d] the information required by the regulations prior to 2011." Mr. Echols responded that he had. We assume, first, that counsel's reference to 2011 was a slip of the tongue. Under the circumstances, it seems obvious that she meant to ask Mr. Echols whether he had assembled the required information before *2012*. But counsel's formulation of the question has another problem. Strictly speaking, it calls for a legal conclusion. Mr. Echols, so far as we know, was not qualified to interpret Treasury Regulation § 1.170-14(g)(5)(i) and would not have been allowed to volunteer his views even if he were. Again, it seems obvious that counsel misspoke. Under the circumstances, we will interpret her question as seeking Mr. Echols's judgment not on the legal issue of what Treasury Regulation § 1.170A-14(g)(5)(i) requires but instead on the factual question of whether the documentation of the condition of the Dover Hall property that Mr. Echols had assembled before December 27, 2011, was sufficient to enable NALT to fulfill its responsibilities of monitoring the partnership's exercise of its reserved rights in the property. And we take Mr. Echols's affirmative answer to mean that, in his judgment, the then-available documentation *was* sufficient for NALT's purposes.

Because counsel was essentially asking Mr. Echols to evaluate his own work, his testimony was hardly disinterested. Indeed, Mr. Echols acknowledged that "it's customary for [him] not to sign" on NALT's behalf the statements required by Treasury Regulation § 1.170A-14(g)(5)(i)(D). The statement ultimately prepared and attached to the baseline documentation in its final form was signed by Steven Carter, NALT's stewardship coordinator. We cannot view as a wholly adequate substitute for a timely signed written statement the testimony of one who, for understandable reasons, would not customarily sign those statements. Even so, the testimony of Mr. Echols, whom we found to be a credible witnesses, provides further grounds for confidence that the documentation of the condition of the Dover Hall property available to NALT before the partnership's conveyance of a conservation easement on the property was sufficient for NALT to effectively monitor the partnership's exercise of its reserved rights in the property.

Contrary to respondent's argument, Mr. Echols's return to the Dover Hall property in the spring to compile additional documentation does not establish that the documentation available in December had been inadequate. As Mr. Echols explained, in 2011, "follow-up spring

30

**[*30]** surveys" were "customary." Apparently, donors tended to make their gifts at the end of the year, presumably in the expectation of obtaining a tax deduction for the year. Therefore, NALT found itself "often visiting the property late in the year." The customary spring surveys allowed NALT to "provide a full ecological picture of the property." The condition of a property, in ecological terms, can obviously change with the seasons. NALT and other donees might well find it useful to document a property's ecological conditions in various seasons. But Treasury Regulation § 1.170A-14(g)(5)(i) does not require year-round documentation. It requires only documentation that establishes the condition of donated property at the time of the gift, in whatever season that happens to be.

In sum, several factors support the conclusion that NALT had sufficient documentation of the condition of the Dover Hall property to fulfill its responsibility of monitoring the partnership's exercise of its reserved rights and thereby ensure the protection in perpetuity of the gift's conservation purposes. The baseline documentation assembled in its final form is accompanied by a written statement signed by Nathaniel Carter and NALT's stewardship coordinator attesting to the adequacy of the documentation. Mr. Echols had assembled most of that documentation by December and the rest a few months later. NALT's board received the then-available documentation on the day it approved the gift and presumably considered the documentation in granting its approval. And, as we interpret Mr. Echols's response to an infelicitously posed question from petitioners' counsel, in his judgment, the documentation he had compiled by December was sufficient for NALT's purposes. We do not view any one of those factors as dispositive. Taken together, however, they convince us that the partnership's imperfect compliance with the baseline documentation rules did not prevent them from achieving their purpose. We are confident that the documentation available to NALT was sufficient to enable it to effectively monitor the partnership's exercise of its reserved rights in the Dover Hall property and thereby ensure the perpetual protection of the conservation purposes of the partnership's gift to NALT. It follows that the baseline documentation rules are directory rather than mandatory, that substantial compliance with those rules would be sufficient, and that the partnership substantially complied.

**[*31]** IV.    *Effect of Reserved Rights on Section 170(h)(5)(A)*

A.    *Applicable Law*

Treasury Regulation § 1.170A-14(e)(2) provides as a general rule that "a deduction will not be allowed if the contribution would accomplish [an] enumerated conservation purpose[] but would permit destruction of other significant conservation interests." The regulations give the example of an easement to preserve farmland "pursuant to a State program for flood prevention and control." *Id.* The easement would not serve the purpose of preserving open space "if under the terms of the contribution a significant naturally occurring ecosystem could be injured or destroyed by the use of pesticides in the operation of the farm." *Id.* The rule provided in Treasury Regulation § 1.170A-14(e)(2), however, "is not intended to prohibit uses of the property . . . if, under the circumstances, those uses do not impair significant conservation interests."

Treasury Regulation § 1.170A-14(f) presents two contrasting examples of scenic easements on property visible from a national park. In example (3), the grantor retains the right to subdivide the property into 90-acre parcels and build one single-family home on each parcel. The example assumes as a fact that "[r]andom building on the property, even as little as one home for each 90 acres, would destroy the scenic character of the view." Treas. Reg. § 1.170A-14(f) (example 3). The example concludes that "[N]o deduction would be allowable under this section." *Id.*

By contrast, the property at issue in example (4) includes some areas "generally not visible from the national park." Treas. Reg. § 1.170A-14(f)(4) (example 4). The easement allows for the building of homes in those areas. The example states: "The donor and the donee have already identified sites where limited cluster development would not . . . impair the view." *Id.* The example concludes that "the donation [of the easement] qualifies for a deduction under this section." *Id.*

Treasury Regulation § 1.170A-14(g)(1) provides:

In the case of any donation under this section, any interest in the property retained by the donor . . . must be subject to legally enforceable restrictions (for example, by recordation in the land records of the jurisdiction in which the property is located) that will prevent uses of the

**[\*32]** retained interest inconsistent with the conservation purposes of the donation.

### B.    *The Parties' Arguments*

#### 1.    *Respondent*

Respondent emphasizes Mr. Wilson's acknowledgment that the partnership's exercise of its reserved rights to limited development of the Dover Hall property would "diminish" the easement's conservation values.  And respondent says that "[p]etitioners' other expert witnesses" "largely agreed."   Respondent alleges that "all three" of petitioners' expert witnesses "agreed that the exercise of the reserved rights would impair, injure, and diminish the conservation interests that the easement sought to protect."

Respondent argues that "the total destruction of a conservation purpose is not necessary for a use to be inconsistent."  Pointing to the example of the open space easement on farmland in Treasury Regulation § 1.170A-14(e)(2), respondent contends that, if a donor's use merely "injures a conservation purpose, that would also be inconsistent with protecting the easement in perpetuity."  That example, again, concludes that the easement would not perpetually protect open space if the use of pesticides could injure or destroy a significant, naturally occurring ecosystem.

Respondent concludes that the partnership's exercise of its reserved rights "would . . . fall within the definition of 'inconsistent uses' contained in Treas. Reg. § 1.170A-14(e)(2)."   Consequently, "the easement is not exclusively for conservation purposes, as required by I.R.C. § 170(h)(1)(C) and Treas. Reg. § 1.170A-14(e), and the deduction claimed should therefore be disallowed."

#### 2.    *Petitioners*

Apparently relying on Treasury Regulation § 1.170A-14(f) (example 4), petitioners contend that "[t]he law allows a Donor to retain rights in the donated conservation property, including the right to build on the property."   Petitioners insist that the rights retained by the partnership under the easement "do not destroy any conservation interests."  Section 3.25.2 of the easement deed, they reason, "ensures that the owner's exercise of any retained right can have no material adverse effect on the conservation purposes or on the significant environmental features of the conservation area."  Petitioners describe

**[\*33]** the testimony of their experts as having "confirmed that the exercise or retained rights would have a negligible impact on the Conservation Purposes."

Citing Mr. Sligh's oral testimony, petitioners posit that NALT, in approving building areas, "would leave some trees and other natural habitat on the lot to enhance the aesthetic value of that lot." And citing Mr. Sligh's written report, they contend that "[t]he development of eleven home sites will not affect the species diversity present within the Conservation Easement." Referring to Mr. Sligh's testimony and Mr. Echols's report and testimony, petitioners assure us that "[t]he presence of nine-docks [sic] along Green Creek would have a negligible effect on the conservation purposes of relatively open space and scenic views."

Petitioners claim to have "presented unrebutted evidence that exercising retained rights would have, at most, a negligible impact on the conservation purposes." And, they observe, "[r]espondent presented no evidence to the contrary."

C.    *Analysis*

The question before us, as we see it, is whether the partnership's exercise of its reserved rights in the Dover Hall property would be "inconsistent with the conservation purposes" of the partnership's donation of the easement to NALT. Treas. Reg. § 1.170A-14(g)(1). Respondent's reliance on Treasury Regulation § 1.170A-14(e)(2) strikes us as misplaced. Treasury Regulation § 1.170A-14(e)(2) generally requires denial of a deduction when the contribution of a qualified real property interest would accomplish its specified conservation purposes but would also "permit destruction of other significant conservation interests." Respondent's position, as we understand it, is that the partnership's reserved rights to limited development of the Dover Hall property would undermine the very conservation purposes for which the partnership claims to have conveyed the easement. Therefore, we view the governing authority as Treasury Regulation § 1.170A-14(g)(1) rather than Treasury Regulation § 1.170A-14(e)(2). And the relevant question under Treasury Regulation § 1.170A-14(g)(1) is whether the partnership's exercise of its reserved rights would be "inconsistent with the conservation purposes" of its donation.

The parties emphasize different aspects of the oral and written testimony of petitioners' three expert witnesses. All three experts

**[*34]** agreed that the building of docks and homesites could have some adverse effects on the conservation values of the Dover Hall property. But they also agreed that any adverse effect would be minimal and that, overall, the easement—taking into account the reserved rights—would protect those conservation values.

Mr. Wilson acknowledged that the building of homes and roads on the Dover Hall property would have "a direct impact to habitats on the conservation area." He agreed that the partnership's exercise of its reserved rights would "diminish" the property's conservation values, "but not significantly." His written report ultimately concludes that "the easement provides for the protection of the conservation values in perpetuity."

Similarly, Mr. Sligh acknowledged that the addition of nine docks on the shoreline of Green Creek would "slightly decrease" the conservation benefits of the shoreline, but they would have "very little negative impact." Mr. Sligh ultimately concluded that the partnership's reserved rights would "not diminish the overall Conservation Values" of the Dover Hall property.

Mr. Echols testified that the 11 homesites would impair the easement's conservation values "to a negligible degree." His written report concludes that "the allowable reserved rights do not affect the perpetuity of the Conservation Area."

All three experts emphasized the importance of the requirement in the easement deed that NALT approve any building sites. Mr. Wilson made the obvious point that the extent to which the building of homesites and associated roads would impair the easement's conservation values would depend on where they were placed. Thus, in reaching their conclusions, all three experts seemed to have assumed that NALT would fulfill its responsibility under the easement deed of denying approval of any exercise of a reserved right that would have a material adverse impact on the easement's conservation values. Mr. Wilson characterized the requirement for NALT's approval as "perhaps the most important provision in the reserved rights."

Section 170(h) and its accompanying regulations obviously and necessarily rest on the premise that donees will enforce their rights in contributed property. Otherwise, no contribution of a qualified real property interest could qualify for a deduction. Therefore, in determining whether the conservation purposes of the partnership's

**[*35]** contribution to NALT will be protected in perpetuity, we must assume—as apparently did petitioners' expert witnesses—that NALT will not approve the partnership's exercise of any reserved rights that would have a material adverse effect on those purposes.[15]

Thus, whether the partnership's contribution satisfies the protected-in-perpetuity requirement of section 170(h)(5)(A) boils down to whether the partnership's use of the property in a manner that would have an *im*material adverse effect on the contribution's conservation purposes would be "inconsistent" with those purposes. Treas. Reg. § 1.170A-14(g)(1). The answer, by definition, is "no." "Immaterial," in this context, means "of no substantial consequence." *Immaterial*, www.merriam-webster.com/dictionary/immaterial (last updated Oct. 26, 2023). An effect that is immaterially adverse should be treated in the same manner as an effect that is not adverse at all. Allowing the possibility of an immaterial adverse effect to determine the partnership's entitlement to a deduction would give the effect substantial consequence, contrary to the normal meaning of "immaterial." We therefore conclude that the partnership's reserved rights in the Dover Hall property do not violate the requirement of section 170(h)(5)(A) that a contribution's conservation purpose be protected in perpetuity.

## V.     *The Easement's Value*

The mandate of the Eleventh Circuit requires us to accept that the easement the partnership conveyed to NALT was a qualified real property interest. We have concluded that the partnership complied with the documentation requirements of Treasury Regulation § 1.170A-14(g)(5)(i) and that the rights the partnership retained in the Dover Hall property do not prevent the contribution's conservation purposes from

---

[15] Our expectation that NALT would deny any request by the partnership to exercise a reserved right that would have a material adverse effect on the easement's conservation purposes rests on more than a "vague hope." *Cf. Pine Mountain Preserve, LLLP*, 151 T.C. at 317 (Morrison, J., dissenting). The easement deed requires NALT to deny approval of a request in those circumstances. We merely accept that NALT will fulfill its responsibilities under the easement deed. In that respect, the facts of the present cases may be distinguishable from those of *Pine Mountain*. In the quoted portion of his dissenting opinion in *Pine Mountain*, Judge Morrison was addressing an easement granted in 2006 (one of three easements at issue in that case). Under terms of the 2006 easement, the donee (also NALT) was apparently allowed, but not required, to "withhold approval if it believes that the Building Area sites proposed by Pine Mountain would 'result in any material adverse effect on any of the Conservation Values or Conservation Purposes.'" *Pine Mountain Preserve, LLLP*, 151 T.C. at 259.

**[\*36]** being protected in perpetuity, as required by section 170(h)(5)(A). Respondent raises no other challenges to the partnership's entitlement to a charitable contribution deduction under section 170(a)(1). Therefore, the partnership is entitled to a deduction equal to the fair market value of the easement at the time of the contribution. *See* Treas. Reg. § 1.170A-1(c)(1).

Each side presented expert testimony on the issue of the easement's value. Before trial, respondent filed a Motion in Limine to exclude the report prepared by petitioners' experts. On the last day of trial, we issued an Order stating that we would take respondent's motion "under advisement." On the day we entered our initial decisions in the cases, we denied respondent's Motion in Limine as moot. In his postremand Status Report, respondent renewed his claim that the Van Sant and Wingard report should be excluded. The admissibility of that report thus presents a threshold issue in determining the value of the easement. For the reasons explained *infra* Part V.A.2, we conclude that the Van Sant and Wingard report is admissible. For the reasons explained *infra* Part V.B, however, Van Sant and Wingard's report does not persuade us that the easement was worth more than the $1,000,000 value determined by respondent's expert, Mr. Ryan.

A.    *Admissibility of Van Sant and Wingard Report*

1.    *The Parties' Arguments*

Respondent argues that Van Sant and Wingard's report does not comply with Rule 143(g)(1), which requires a party who plans to call an expert witness to have the expert submit a written report that, among other things, includes "a complete statement of all opinions the witness expresses and the basis and reasons for them." Respondent argues that the Van Sant and Wingard report fails to identify specific opinions with either of its coauthors. That failure, according to respondent, "significantly impair[ed his] ability to cross-examine the authors, while also denying [him] the reasonable opportunity to obtain evidence in rebuttal to the authors' testimony, because [he] ha[d] no basis upon which to determine which author wrote which portions of the report." Respondent claims that Van Sant and Wingard's allegedly inconsistent testimony at trial concerning the portions of the report that each authored simply confirms his position regarding its admissibility.

In further support for his argument, respondent cites *Estate of Noble v. Commissioner*, T.C. Memo. 2005-2, 2005 WL 23303. In that

**[\*37]** case, we excluded from evidence a report prepared by the appraisal firm Shenehon Co. Although the report indicated on its face that it had been prepared by three individuals—presumably officers or employees of Shenehon—only one of those individuals was available for trial. We excluded the report from evidence "on the basis of" our earlier opinion in *Bank One Corp. v. Commissioner*, 120 T.C. 174, 278 (2003), *aff'd in part, vacated in part, and remanded sub nom. JPMorgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006). *Estate of Noble v. Commissioner*, 2005 WL 23303, at \*2. In *Bank One*, on the Commissioner's motion, we had excluded a rebuttal report of one of the taxpayer's experts. The Commissioner claimed that the rebuttal report "was tainted in its preparation by the significant participation of [the taxpayer's] counsel." *Bank One*, 120 T.C. at 278. In articulating the basis for our decision to grant the Commissioner's motion, we noted that the expert "never explained to our satisfaction that the words, analysis, and opinions in that report were his own work." *Id.*

Petitioners argue that *Noble* is distinguishable from their cases because, in *Noble*, only one of the three authors of the rejected joint report was able to testify. More generally, petitioners argue that Rule 143(g) does not prohibit joint expert reports and assert that experts who prepare a joint report need not explain which portions of the report each wrote. They cite prior cases in which we have accepted joint expert reports. *See Esgar v. Commissioner*, T.C. Memo. 2012-35, *aff'd*, 744 F.3d 648 (10th Cir. 2014); *Estate of Ford v. Commissioner*, T.C. Memo. 1993-580, *aff'd*, 53 F.3d 924 (8th Cir. 1995); *Estate of Dougherty v. Commissioner*, T.C. Memo. 1990-274; *Jacobson v. Commissioner*, T.C. Memo. 1989-606.[16]

Respondent counters that the cases petitioners rely on are no longer authoritative because they do not reflect the changes to the Federal Rules of Evidence (FRE) concerning expert testimony adopted to reflect the Supreme Court's opinions in *Daubert v. Merrell Dow*

---

[16] Petitioners also cite a much earlier opinion, *Fogle v. Commissioner*, T.C. Memo. 1966-148, 1966 Tax Ct. Memo LEXIS 134. The findings of fact in that case include a reference to a submission to "the court" of a "joint appraisal" by two appraisers. *Id.* at \*3. But that report was received by an Indiana state court in an action for the partition and sale of jointly owned property. The taxpayer in that case, one of the joint owners, objected to the sale and refused to accept his share of the proceeds. We concluded that he was subject to tax on his share of the proceeds under the constructive receipt doctrine.

**[\*38]** *Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

*Daubert* held that the FRE provisions concerning expert testimony then in effect had superseded prior caselaw under which that testimony could be admitted only if grounded in principles that had received general acceptance in the relevant field. *See Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Although *Daubert* dealt with scientific testimony, *Kumho Tire* extended *Daubert*'s holding to testimony based on technical or other specialized knowledge. *Daubert* and *Kumho Tire* did not, however, remove all restrictions on the admissibility of expert testimony. The cases envision that a trial judge considering an offer of expert testimony will serve a "gatekeeping" function, *see Kumho Tire*, 526 U.S. at 141, admitting only evidence that, even if not grounded in generally accepted principles, is nonetheless both reliable and relevant to the case at hand. In 2000, Congress amended FRE 702 to codify *Daubert*'s reliability requirement. As amended, the Rule allows expert testimony only if it is "based on sufficient facts or data" and "the product of reliable principles and methods," and if the expert "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

2. *Analysis*

While petitioners are correct that Rule 143(g) does not flatly prohibit joint expert reports, respondent's argument does not rest on that proposition. As we understand him, respondent argues that a joint report does not comply with Rule 143(g) unless it identifies the specific opinions and analysis for which each author takes responsibility.

But we do not regard the appraisal that Van Sant and Wingard prepared as deficient in that respect. Their report includes a certification by each of them taking responsibility for all of the report's analysis, opinions, and conclusions. Respondent points to nothing in the report that would indicate that some opinions and analyses were those of only one of its two signatories. (While Mr. Wingard acknowledged occasional disagreements, he testified that he and Mr. Van Sant were able to resolve them and arrive at mutually acceptable conclusions.)

Any questions about who actually put pen to paper (or, more likely, fingers to keyboard) in the preparation of the report strike us as beside the point. An expert report compliant with Rule 143(g) must state the witness' conclusions and analysis. Satisfaction of that

**[\*39]** condition does not require every word in the report to spring from the witness' brow. Words written by another can accurately express the witness' views. If the witness is willing to adopt those words as his own and stand behind the conclusions they express and the analysis supporting them, it should be of no moment that the witness was not the initial author.

Requiring every word in an expert report to be identified with an individual author who is available to testify would greatly hinder our ability to rely on experts who work in firms. The larger and more complex the matter, and the more participants needed to prepare a report, the less likely its admission into evidence would be.

Although petitioners were unable to cite a post-*Daubert* case in which we received a joint expert report,[17] we do not view the changes in standards regarding expert testimony initiated by *Daubert* as being particularly germane to the issue of joint reports. *Daubert* and *Kumho Tire* liberalized the standards for admitting expert testimony by allowing for the admission of opinions based on analysis that had not received general acceptance in the relevant field. *Daubert* also emphasized that expert testimony must nonetheless be assessed as reliable. But reports whose preparation involved multiple participants are not inherently less reliable than those of a single author. If anything, the consideration and synthesis of multiple viewpoints may enhance reliability.

While we acknowledge some tension between our opinion in *Noble*, on which respondent relies, and our earlier opinion in *Ford*, which petitioners cite, we do not attribute their possibly divergent results to intervening Supreme Court precedent. *Ford*, like *Noble*,

---

[17] Although *Esgar v. Commissioner*, 2012 WL 371809, postdated *Daubert*, *Kumho Tire*, and the 2000 amendment to FRE 702, we do not view *Esgar* as involving a joint report. The report at issue in *Esgar* might be more accurately described as a "meta-report." In that case, which addressed the contribution of a conservation easement, the Commissioner objected to a report prepared by one of the taxpayer's experts, a Mr. Emmerling. Mr. Emmerling's report, as we described it, "summarized, and in certain situations corrected, the conclusions of [the taxpayers'] other experts." *Esgar v. Commissioner*, 2012 WL 371809, at \*11. The Commissioner objected to Mr. Emmerling's report because it was based on the opinions and analysis of the taxpayers' other experts rather than "independent data and information." *Id.* at \*12. We agreed with the taxpayers that Mr. Emmerling's report could "assist the Court" and thus admitted it. *Id.* Although Mr. Emmerling's report reviewed conclusions of other experts, his analysis of those conclusions was his own. Whatever other issues his report might have raised, uncertainty of authorship was not one of them.

**[*40]** involved an appraisal report prepared by three individuals on behalf of Shenehon Co., only one of whom testified at trial. We admitted the Shenehon report and used it as the principal basis for our conclusion regarding the value of the closely held stock in issue. Our opinion in *Ford* gives no indication that the Shenehon report in that case did not accurately reflect the views of the available witness. By contrast, our statement in *Noble* that our opinion in that case was based on *Bank One* indicates that we had reason for suspicion about the extent to which the Shenehon representative who appeared at trial stood behind the report's conclusion. If that were the case, however, we did not articulate in our opinion the basis for any such suspicions. Therefore, we accept that *Ford* and *Noble* might, on their surfaces, be difficult to reconcile. We see no reason, however, to attribute the different results in those cases to intervening changes in the rules concerning expert testimony.

We therefore reject respondent's arguments for excluding Van Sant and Wingard's report. Although we have considered that report in determining the value of the easement, for the reasons explained *infra* Part V.B, we do not find the report reliable.

B. *The Van Sant and Wingard Report's Reliability*

Respondent argues that, even if we admit Van Sant and Wingard's report into evidence (as we have decided to do), we should give their conclusions "little, if any, weight." Respondent points to the difficulty Van Sant and Wingard had in explaining the 30% adjustment they made for the effect of the easement on the value of the Dover Hall property and the inconsistency of their testimony on that point.

By contrast, petitioners suggest that the 30% adjustment Van Sant and Wingard made for the effects of the easement was too low. They observe that a 9.7% reduction in units/landmass and a 20% reduction in docks "produces a reduction of approximately 30% of the 'on paper' attributes." But reducing Dover Hall's value by 30% to account for the easement would have been appropriate, they reason, only "if all acres were created equal." On the premise that the easement covers Dover Hall's most valuable acres, petitioners suggest that "a 30% reduction may not be enough." (Petitioners do not provide any more explanation than did Van Sant and Wingard of the rationale for simply summing the percentage reductions in various attributes without weighting those reductions by the portion of Dover Hall's total value accounted for by those attributes.)

**[\*41]** We agree with respondent that Van Sant and Wingard's inability to explain their determination that the easement reduced by 30% the value of the Dover Hall property renders their report unreliable. Their summation of the percentage reductions in various attributes has no apparent logic. Simply summing up the percentage reductions in acreage available for development, residential units that can be developed, or docks that can be built does not take into account the extent to which those attributes contribute to the property's total value.[18] Van Sant and Wingard's conclusion that the easement was worth $10,300,000 rests on the proposition that the easement reduced by 30% the value of the Dover Hall property. Because they failed to establish the validity of that proposition, we cannot rely on the conclusion they drew from it.

C. *Mr. Ryan's Report*

By contrast, we found Mr. Ryan's report credible. By comparing the value of the Dover Hall property before the grant of the easement to its value thereafter, having been unable to identify appropriate sales of easements to use as frames of reference, Mr. Ryan complied with Treasury Regulation § 1.170A-14(h)(3)(i). That section provides, in relevant part, that

> [i]f there is a substantial record of sales of easements comparable to the donated easement . . . the fair market value of the donated easement is based on the sales prices of such comparable easements. If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule . . . the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction. The amount of the deduction in the case of a charitable contribution of a perpetual conservation restriction covering a portion of the contiguous property owned by a donor and the donor's family . . . is the difference between the fair market value of the entire contiguous parcel of property before and after

---

[18] Under Van Sant and Wingard's logic, a thief who absconded with one of a car's four doors (25% of the total), one of its four tires (also 25%), and two of its four sparkplugs (50%) should congratulate himself on having stolen the entire car.

**[\*42]** the granting of the restriction. If the granting of a perpetual conservation restriction . . . has the effect of increasing the value of any other property owned by the donor or a related person, the amount of the deduction . . . shall be reduced by the amount of the increase in the value of the other property, whether or not such property is contiguous.

Petitioners challenge the reliability of Mr. Ryan's report on several grounds. None of petitioners' challenges, however, convinces us that Mr. Ryan's analysis was unsound.

Petitioners argue that Mr. Ryan relied on inappropriate reference transactions for his "before" analysis. Petitioners dismiss those transactions as "distressed sales of timber tracts with little or no water influence." Referring to those properties and the transactions in which they sold, petitioners claim "one was in receivership, one in bankruptcy, one in judicial foreclosure and one sold in a bank sale."[19]

Petitioners also suggest that Mr. Ryan did not adequately inspect the Dover Hall property. In their opening brief, petitioners claimed: "Mr. Ryan admitted he never saw the full expanse of Green Creek nor fully understood the boundaries of the Conservation Easement." Petitioners' reply brief escalated that argument: Mr. Ryan, they claim, "admits not seeing Green Creek or the easement, so he has no basis for determining value."

Petitioners challenge the roughly $15 million preeasement value Mr. Ryan assigned to the Dover Hall property on the ground that it is inconsistent with the benchmark established by petitioner Evans's purchase of a 50% interest in the partnership for $30 million less than three years before the partnership's donation of the easement. They claim that Mr. Evans's purchase put a value on the Dover Hall property of "at least $60 million"[20] and profess incredulity that the property could

---

[19] Mr. Ryan's report acknowledged that two of his comparable sales were out of foreclosure. At trial, he testified that he knew that the seller in another sale had been in bankruptcy. While the selling entity in the fourth sale may have been under common ownership with another entity that was in receivership, the record does not establish that the seller itself was in receivership.

[20] On the premise that the price Mr. Evans paid for his interest in the partnership would have reflected a discount for lack of control, petitioners argue that that price implied a "total value" for the Dover Hall property "closer to $75 million or $80 million."

**[*43]** lose "75 percent of [its] overall value . . . over the course of two and a half years."

Petitioners also insinuate that Mr. Ryan's determination of different per-acre values for the portions of the Dover Hall property within and outside the easement violates the rule of Treasury Regulation § 1.170A-14(h)(3)(i) that requires the valuation of the entire contiguous property owned by the donor. They note that Van Sant and Wingard "prepared their appraisal in accordance with" the requirement that "they value the entire 5,145 acre tract before the donation and again after the donation," and compare that approach favorably to Mr. Ryan's use of "small sales of easement properties in his after value methodology."

Petitioners' claims about the adequacy of Mr. Ryan's inspection of the Dover Hall property do not, in our judgment, undermine the reliability of his report. Although Mr. Ryan admitted that he did not recall seeing Green Creek on his initial visit to the property, he testified that he had observed the creek on a later visit. To the extent that Mr. Ryan was unsure of the easement's precise boundaries, that uncertainty was not due to a lack of diligence on his part but instead to the caretaker's inability to identify the boundaries. And even if Mr. Ryan could not visually inspect the easement's exact boundaries, we accept that his visit to the property gave him an adequate sense of the nature of the property covered by the easement. To accuse Mr. Ryan of having failed to see Green Creek or the property subject to the easement at all (as petitioners do in their reply brief) is an obvious overstatement.

Petitioners' principal complaint about Mr. Ryan's report is that the comparable sales he used to determine the preeasement value of the Dover Hall property were, in their view, not really comparable; they were distressed sales of timberland with no water influence. But Mr. Ryan made adjustments where he could to back out the value of merchantable timber.[21] And he took the properties' water features into account in ranking them as either superior or inferior to the Dover Hall

---

[21] Mr. Ryan's failure to adjust for the timber value of the one property he considered superior to the Dover Hall property increased the preeasement value he assigned to the Dover Hall property, and thus also increased the value he assigned to the easement.

**[\*44]** property.[22]   Although Mr. Ryan did not adjust his values (or otherwise take into account as a negative factor) the conditions of his comparable sales, he explained at trial the basis for his confidence that in no case did a seller's motivation to sell result in the acceptance of a price that did not reflect the property's true value.

We do not view Mr. Ryan's assignment of a differing value to each acre of Dover Hall within the easement and each acre outside it as violating the rule of Treasury Regulation § 1.170A-14(h)(3)(i) that requires the valuation of the entire contiguous parcel owned by the donor from which the easement is carved out.  That requirement allows for consideration of the extent to which a conservation easement increases the value of surrounding property owned by the donor or a related party.  Neither the terms of the rule nor its apparent rationale requires assigning a uniform value to each acre of the property.  It should be expected that the portions of the overall parcel subject to restriction would be worth less per acre than the portions whose use is not so limited.  Indeed, as respondent points out, Van Sant and Wingard's use of uniform per-acre values leads to several incongruities.[23]

We do not find Mr. Evans's purchase of a 50% interest in the partnership in April 2009 probative of the value of the easement upon its donation to NALT in December 2011.  To begin with, the record does not establish the composition of the partnership's assets when Mr. Evans purchased his interest.[24]  Even if we were to accept that, at that time, the partnership owned the Dover Hall property as its only asset, Mr. Evans's purchase of his partnership interest would at most establish only that the property was worth around $60 million in April 2009.  That datum might have some bearing on Dover Hall's value 32 months later.  *But see RERI Holdings I, LLC v. Commissioner*, 149 T.C. 1, 41 (2017) (opining that "evidence of [a] property's value in February

---

[22] If the absence of water features renders a property invalid as a frame of reference in valuing the Dover Hall property, then three of the comparables Van Sant and Wingard used would be invalid as well.

[23] For example, as respondent observes, the value Van Sant and Wingard assigned to the easement ($10,300,000) exceeds the product of the 500 acres covered by the easement and the $9,000 per-acre value they assigned to the Dover Hall property before the grant of the easement (500 acres × $9,000 = $4,500,000).

[24] Because the parties' Stipulation concerning the partnership's assets uses the present tense, it speaks only as of April 2017 and does not establish what the partnership owned at any earlier time, including when Mr. Evans purchased his interest in the partnership.

**[\*45]** 2002 . . . is of limited worth in assessing the property's value [when donated to a charitable organization] in August 2003"), *aff'd sub nom. Blau v. Commissioner*, 924 F.3d 1261 (D.C. Cir. 2019). We might also accept that a 75% decline in the value of property in less than three years would be relatively unusual. But both Mr. Ryan's report and that of Van Sant and Wingard indicate that the Dover Hall property declined in value during that period (as, indeed, did the qualified appraisal prepared in connection with the partnership's return). And a diminished value of the Dover Hall property as a whole in December 2011 is only part of the inquiry. Determining that value is only a step in the ultimate objective of valuing the easement the partnership conveyed to NALT. At most, the price Mr. Evans paid for his interest in the partnership might indicate that Mr. Ryan undervalued the easement to some extent. As explained below, however, petitioners have not offered us a reliable means of determining a higher value.

D.    *Conclusion*

We therefore accept Mr. Ryan's determination that the easement the partnership conveyed to NALT on December 27, 2011, was worth $1,000,000 at that time. We found Mr. Ryan's analysis sound and his defense of that analysis convincing. In particular, he addressed to our satisfaction the questions petitioners raised about the comparability of the properties he used as points of reference in his "before" analysis.

Petitioners have given us no reliable means of determining a value for the easement, as of December 27, 2011, higher than $1,000,000. Petitioners ultimately ask us to determine that the easement was worth $17,656,981—an amount well in excess of both the amount reported on the partnership's return and the value determined by their own experts. Petitioners describe their proposed value for the easement as "[a] before value of $58,856,605 less [their experts'] 30% reduction." Petitioners' asserted "before" value appears to be based on the price Mr. Evans paid for his 50% interest in the partnership, but if that was their intent, they seem to have made an arithmetic error.[25]

The $17,656,981 value that petitioners ultimately ask us to assign to the easement by combining (i) the price Mr. Evans paid for his interest in the partnership and (ii) Van Sant and Wingard's 30% adjustment to reflect the diminution of the value of the Dover Hall

---

[25] Mr. Evans paid $29,428,027 for his interest in the partnership; that amount divided by 0.5 is $58,856,054.

[*46] property caused by the easement is no more reliable than its constituent parts.  Mr. Evans's purchase in April 2009 is of little or no relevance in determining the value of the Dover Hall property in December 2011, and Van Sant and Wingard's 30% adjustment is either inexplicable or—to the extent we credit the explanation they offered at trial—illogical.

VI.   *Valuation Misstatement Penalties*

Section 6662(a) and (b)(3) imposes an accuracy-related penalty if any part of an underpayment of tax required to be shown on a return is due to a substantial valuation misstatement.  The penalty is 20% of the portion of the underpayment of tax to which the section applies. § 6662(a).  In the case of a gross valuation misstatement, the penalty rate is increased from 20% to 40%.  § 6662(h)(1).  The substantial valuation misstatement penalty applies to any portion of an underpayment that is attributable to the taxpayer's claiming on a return a value or basis that is 150% or more of the correct value or basis. § 6662(e)(1).  The gross valuation misstatement penalty applies if the claimed value or basis is 200% or more of the correct amount. § 6662(h)(2).  The penalty for a valuation misstatement does not apply, however, unless the portion of the taxpayer's underpayment for a taxable year attributable to either a substantial or a gross valuation misstatement exceeds $5,000 (or, in the case of most corporations, $10,000).  § 6662(e)(2).

Section 6664(c) provides an exception to the accuracy-related (and fraud) penalties if there was reasonable cause for the portion of the underpayment subject to the penalty and the taxpayer acted in good faith with respect to that portion.  Section 6664(c)(3), however, limits the availability of the reasonable cause exception in the case of valuation misstatements with respect to property other than marketable securities for which the taxpayer claimed a charitable contribution deduction.  Under that section, the reasonable cause exception does not apply in the case of a gross valuation misstatement.  In addition, the exception does not apply in the case of a substantial valuation misstatement unless "(A) the claimed value of the property was based on a qualified appraisal made by a qualified appraiser, and (B) in addition to obtaining such appraisal, the taxpayer made a good faith investigation of the value of the contributed property."

Although taxpayers generally bear the burden of proof under Rule 142(a), section 7491(c) provides that "the Secretary shall have the

**[\*47]** burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title." In *Dynamo Holdings Ltd. Partnership v. Commissioner*, 150 T.C. 224, 226 (2018), we held that "the Commissioner does not bear the burden of production with respect to penalties in a partnership-level proceeding." But the holding of that opinion and its underlying rationale are limited to partnerships subject to TEFRA's unified partnership audit and litigation rules. Although the present cases involve deductions claimed by a partnership, we concluded in our prior opinion that that partnership is subject to the small partnership exception to the TEFRA rules. § 6231(a)(1)(B); *Carter*, T.C. Memo. 2020-21, at \*3 n.3. Therefore, the cases before us involve "the liability of . . . individual[s] for . . . penal[ties]," within the meaning of section 7491(c).

To meet his burden of production under section 7491(c), the Commissioner must produce evidence regarding the appropriateness of imposing the penalty. *Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). If the Commissioner satisfies his burden of production, "the taxpayer must come forward with evidence sufficient to persuade a Court that the Commissioner's determination is incorrect." *Id.* at 447. Once the Commissioner satisfies his burden of production, the taxpayer generally has the burden of proof with respect to exculpatory factors such as reasonable cause. *See id.* at 446–47.

The Commissioner's burden of production under section 7491(c) requires him to establish compliance with the supervisory approval requirements of section 6751(b)(1). *Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016); *Carter*, T.C. Memo. 2020-21, at \*27. Section 6751(b)(1) provides: "No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher-level official as the Secretary may designate."

As noted at the outset, in our initial opinion in these cases, we concluded that respondent had not met his burden of demonstrating timely supervisory approval in compliance with section 6751(b)(1). In light of the Eleventh Circuit's reversal of our decisions, however, we must accept that supervisory approval was timely and that respondent has met that aspect of his burden of production under section 7491(c).

**[\*48]** It follows from our conclusion as to the value of the easement the partnership conveyed to NALT that respondent has met the rest of his burden under section 7491(c) and has established the appropriateness of gross valuation misstatement penalties. Because the $14,175,000 value for the easement claimed on the partnership's return was well more than 200% of the $1,000,000 we have determined to have been the easement's correct value on the relevant date, the partnership's reporting effected a gross valuation misstatement, within the meaning of section 6662(e)(1)(A) and (h)(2)(A). Because of the magnitude of the partnership's misstatement, its partners cannot avoid gross valuation misstatement penalties by availing themselves of the reasonable cause exception of section 6664(c). Therefore, petitioners are subject to 40% gross valuation misstatement penalties on the portions of their underpayments attributable to the excess of the value of the easement reported on partnership's return over $1,000,000.

*Decisions will be entered under Rule 155.*